The CITY OF EL PASO, Appellant,

v.

Pedro HERNANDEZ, Individually and on behalf of all statutory beneficiaries of the Estate of Andrea Hernandez, Deceased, Appellees.

No. 08–99–00315–CV.

Court of Appeals of Texas,
El Paso.

March 16, 2000.

John Gates, Asst. City Atty., El Paso, for Appellant.

Gil Gonzalez, M. Mitchell Moss, Robles, Bracken, Coffman & Hughes, L.L.P., El Paso, for Appellee.

Before Panel No. 4 BARAJAS, C.J., LARSEN, and McCLURE, JJ.

## OPINION

McCLURE, Justice.

Pedro Hernandez, Individually and on behalf of all statutory beneficiaries of the Estate of Andrea Hernandez, Deceased (Appellees), brought this negligence case under the Texas Tort Claims Act based on an allegation that the delay in dispatching an ambulance from one El Paso hospital to another resulted in the death of Andrea Hernandez. Raising five issues for review, the City of El Paso brings an interlocutory appeal from the denial of its motion for summary judgment and plea to the jurisdiction based on sovereign immunity. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 51.014(a)(5) & (a)(8)(Vernon Supp.2000). The facts of this case present not only a frightening but egregious example of the harm which results from the failure of an emergency ambulance service to properly implement a patient transport policy when a patient's life hangs in the balance.[1] Despite the heroic efforts of several physicians and other personnel to expedite the transfer and then to ultimately save the patient's life, the unnecessary delay in dispatching an ambulance resulted in the death of Andrea Hernandez. The issue before us, however, is not whether the City of El Paso was negligent, but rather whether this claim falls within the Texas Tort Claims Act so that the City of El Paso's sovereign immunity is waived.

Finding error, we reverse and remand for trial against the remaining defendant.

## FACTUAL SUMMARY

On the morning of October 5, 1993, fifty-six-year-old Andrea Hernandez became ill at her El Paso home and told her daughter, Sylvia Hernandez, that she needed to go to the hospital. When Sylvia saw her mother begin "clamping her teeth," she called 9-1-1. An ambulance quickly arrived and transported Mrs. Hernandez to Thomason Hospital even though she lived much closer to Columbia Medical Center East. Surgeons at Thomason performed emergency exploratory surgery and determined that Mrs. Hernandez suffered from a dissecting aneurysm in the ascending aorta. Because further treatment required a heart-lung machine which Thomason did not have, Dr. Michael Oszczakiewicz,[2] chief of thoracic surgery at Thomason, determined that Mrs. Hernandez should be transferred immediately by ambulance to Providence Hospital in El Paso. A doctor at Thomason, identified in the record only as Dr. Hiller, contacted Emergency Medical Services (EMS) to initiate the transfer of Mrs. Hernandez to Providence. Raul Ponce, an EMS dispatcher, advised Dr. Hiller that due to an EMS policy pertaining to the emergency transfer of patients from one hospital to another, he could not dispatch an ambulance until the administration office at Providence notified EMS that Providence had accepted the patient. That policy also required that a doctor or nurse accompany the patient. Before concluding the call, Dr. Hiller informed Ponce that Dr. Oz was both the transferring and accepting physician and would accompany Mrs. Hernandez to Providence. When Jane Odom, a Thomason nursing supervisor, later called to determine whether an ambulance had been dispatched, Ponce reiterated the require-

---

1. We will not comment in this interlocutory appeal on the alleged negligence of Providence Memorial Hospital since that issue has not been fully developed and is not before us.

2. Because Dr. Oszczakiewicz is referred to as "Dr. Oz" by all persons having occasion to pronounce his name, we will do likewise throughout the remainder of this opinion.

ments of the transfer policy. Odom then called the administrative secretary at Providence several times in an effort to obtain that institution's approval of the transfer. Each time, the administrative secretary told Odom that they were still looking for the administrator. Other evidence showed that the administrator could not be reached because he was out of town. Similarly, personnel in Thomason's admitting office repeatedly called the admitting office at Providence to determine whether they would accept the patient but could not obtain an answer. Dr. Oz also called Providence's administrative office in an effort to obtain the approval needed by EMS.

At an undetermined time later, EMS personnel who had just transported another patient to Thomason contacted Ponce and informed him that Thomason was requesting that they immediately transfer Mrs. Hernandez to Providence. Ponce again insisted that the transfer would not be authorized until Providence accepted the patient. Ponce then contacted his field supervisor, Divenus "Tiny" Parker, about the situation. When she agreed that Mrs. Hernandez could not be transferred until Providence accepted her, Ponce asked Parker to call Thomason because they had been "hassling" him. At some point after this call, Alice Gordon, the administrator on call at Providence, called Ponce and informed him that Dr. Oz had just spoken with her about Mrs. Hernandez and the need for her to be transferred to Providence immediately. She specifically informed Ponce that she was the administrator on call and that Providence would accept the patient, and she requested that EMS "please hurry." Despite having all of the information he needed to authorize the ambulance waiting at Thomason to transfer Mrs. Hernandez, Ponce did not do so.

Several minutes later, Dr. Oz called Ponce in an effort to stress the emergency nature of the situation and to find out why EMS would not transfer Mrs. Hernandez.

When Ponce attempted to argue with the doctor about the need for the transfer by telling him that Mrs. Hernandez was already in a facility where she could be treated, Dr. Oz quickly corrected him and stated that she could not be treated at Thomason because they did not have a heart-lung machine. Dr. Oz told Ponce that it had been thirty minutes since they first requested the ambulance and that Mrs. Hernandez was dying. Ponce replied that he would have his supervisor call Dr. Oz.

After hanging up with Dr. Oz, Ponce called Providence's admitting office in an effort to determine whether Providence had accepted the transfer. Ponce initially told Providence that the patient's name was Alice Gordon (the name of Providence's administrator on call who he had spoken with only minutes earlier) but after a few moments, he realized that was not correct. He also had difficulty in relaying the diagnosis and the reason for the transfer but he finally gave them that information after speaking with someone else at EMS. Providence informed Ponce that they would have to call him back. Ponce then called Parker and told her that he was angry because Dr. Oz had threatened him and said he not doing his job. They discussed how they had these "threats" on tape. After discussing these matters of personal interest, Ponce finally told Parker that Alice Gordon, who he misidentified as a "nursing supervisor" from Providence, had accepted the patient and he asked Parker whether they could accept that authorization. Parker replied that the authorization had to be from a doctor and said that they still needed to know precisely where at Providence the patient was to be taken. Ponce told Parker that the patient's chest had been opened up and that she was "going down bad." After discussing whether they should authorize the transfer, Parker continued to insist that they needed to know where the patient was supposed to go once at Providence.

Ponce concluded this call with Parker without authorizing the transfer.

Sometime after this call, Eduardo Martinez, another EMS dispatcher, received a call from Charlie Lozano, an EMS medic, who informed Martinez that one of the doctors at Thomason wanted them to transfer Mrs. Hernandez to the helicopter pad immediately. Martinez told them to wait because they had Parker on the line and they were waiting for her to authorize the transfer. Lozano put Dr. Salcedo from Thomason on the line who told Martinez that they had opened up the chest of Mrs. Hernandez and found that she had an aortic dissection and they could not do anything further at Thomason. He also told Martinez that "she's got only a few minutes" and that her life depended on whether she got to Providence "now." He additionally gave Martinez the same information that had been given to Ponce earlier, that is, Dr. Oz would be the accepting physician at Providence and he would be traveling with the patient. When Dr. Salcedo asked whether they could get the approval from the supervisor while en route with the patient, Martinez replied that they could not. Still later, an unidentified dispatcher at EMS spoke with EMS personnel in the ambulance located either at or near Thomason to determine exactly where at Providence Mrs. Hernandez needed to be transferred. The ambulance personnel replied that she needed to go directly to the "O.R." At this point, the dispatcher finally authorized them to transfer Mrs. Hernandez.

Tragically, Mrs. Hernandez died in the operating room at Providence. Later that same day, Dr. Oz called EMS and informed them that Mrs. Hernandez had died as a result of their substantial delay in dispatching the ambulance. Although the evidence does not reflect the exact amount of time which passed before EMS dispatched the ambulance, Dr. Oz stated in his written death summary that there was a delay of thirty to forty-five minutes.

On August 31, 1995, Appellees filed suit against the City of El Paso and the El Paso Hospital District, operating as R.E. Thomason General Hospital, under the Texas Tort Claims Act, and they filed a negligence claim against Providence Memorial Hospital.[3] With regard to its suit against the City of El Paso, Appellees alleged first that sovereign immunity had been waived in that EMS employees negligently used and misused tangible personal property, including emergency vehicles, in misdiagnosing the severity of Mrs. Hernandez's condition and transporting her to Thomason rather than Columbia Medical Center East. They also alleged that the negligent use and misuse of tangible personal property, including electronic communications equipment and telephones, caused a failure to timely transport Mrs. Hernandez, and ultimately, resulted in her death. They further alleged that EMS violated certain city ordinances by failing to transport Mrs. Hernandez to the nearest hospital and in failing to timely transport her from Thomason to Providence.

On July 30, 1999, the City of El Paso filed a motion for summary judgment and plea to the jurisdiction on the ground that it is entitled to sovereign immunity because Appellees' claim does not fall within the categories of liability found in the Tort Claims Act, namely, the negligent operation or use of a motor vehicle or the negligent use or misuse of tangible personal property. The trial court denied the motion for summary judgment and plea to the jurisdiction. The City challenges that ruling in this interlocutory and accelerated appeal.

## STANDARD OF REVIEW

The standard of review on appeal is whether the successful movant at the trial level carried the burden of showing that there is no genuine issue of material fact and that a judgment should be granted as a matter of law. *Lear Siegler, Inc. v.*

3. Appellees dismissed their suit against Tho-      mason as part of a settlement agreement.

*Perez,* 819 S.W.2d 470, 471 (Tex.1991); *Nixon v. Mr. Property Mgmt. Co., Inc.,* 690 S.W.2d 546, 548 (Tex.1985); *Duran v. Furr's Supermarkets, Inc.,* 921 S.W.2d 778, 784 (Tex.App.—El Paso 1996, writ denied). Thus, the question on appeal is not whether the summary judgment proof raises fact issues as to required elements of the movant's cause or claim, but whether the summary judgment proof establishes, as a matter of law, that there is no genuine issue of material fact as to one or more elements of the movant's cause or claim. *Gibbs v. General Motors Corp.,* 450 S.W.2d 827, 828 (Tex.1970); *Duran,* 921 S.W.2d at 784. Where the defendant is the movant, it must conclusively establish each essential element of an affirmative defense, such as sovereign immunity. *Camacho v. Samaniego,* 954 S.W.2d 811, 817 (Tex.App.—El Paso 1997, writ denied). In resolving these issues, all evidence favorable to the non-movant must be taken as true and all reasonable inferences, including any doubts, must be resolved in the non-movant's favor. *Nixon,* 690 S.W.2d at 548–49; *Duran,* 921 S.W.2d at 784.

## SOVEREIGN IMMUNITY

In Issues One, Two, Four, and Five, the City of El Paso argues that the trial court erred in denying its motion for summary judgment and plea to the jurisdiction because Appellees failed to plead and prove waiver of sovereign immunity under the Texas Tort Claims Act (the Act). Appellees respond that waiver of sovereign immunity exists not only under Section 101.021 of the Act, but also independently under Section 101.055 and Section 101.062, which pertain to emergency services. We disagree.

▉ A municipality such as the City of El Paso is immune from liability for its governmental functions unless that immunity is specifically waived. *City of La-Porte v. Barfield,* 898 S.W.2d 288, 291 (Tex.1995); *Gonzales v. City of El Paso,* 978 S.W.2d 619, 622 (Tex.App.—El Paso

1998, no pet.). By designating the operation of emergency ambulance service as a governmental function,[4] the Legislature has shrouded this function with immunity unless a claim falls within one of three specific areas of liability for which immunity is waived by Section 101.021 of the Tort Claims Act. *See Medrano v. City of Pearsall,* 989 S.W.2d 141, 144 (Tex.App.—San Antonio 1999, no pet. h.); *McKinney v. City of Gainesville,* 814 S.W.2d 862, 865 (Tex.App.—Fort Worth 1991, no writ).

Section 101.021 of the Act provides that a governmental unit in the state is liable for:

> (1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:
>
> > (A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and
> >
> > (B) the employee would be personally liable to the claimant according to Texas law; and
>
> (2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX.CIV.PRAC. & REM.CODE ANN. § 101.021 (Vernon 1997).

Despite the waiver found in Section 101.021, a governmental unit specifically retains its immunity in claims arising from:

> [T]he action of an employee while responding to an emergency call ... if the action is in compliance with the laws and ordinances applicable to emergency action, or in the absence of such a law or ordinance, if the action is not taken with conscious indifference or reckless disregard for the safety of others.

4. TEX.CIV.PRAC. & REM.CODE ANN.   § 101.0215(a)(18)(Vernon Supp.2000).

TEX.CIV.PRAC. & REM.CODE ANN. § 101.055(2); *Borrego v. City of El Paso*, 964 S.W.2d 954, 957 (Tex.App.—El Paso 1998, writ denied). Similarly, in the case of 9–1–1 emergency services like that involved here, Section 101.062 further provides:

This chapter applies to a claim against a public agency that arises from an action of an employee of the public agency or a volunteer under direction of the public agency and that involves providing 9–1–1 service or responding to a 9–1–1 emergency call only if the action violates a statute or ordinance applicable to the action.

TEX.CIV.PRAC. & REM.CODE ANN. § 101.062(b).

### *Waiver under Sections 101.055 and 101.062*

We will first address Appellees' assertions that regardless of the applicability of Section 101.021 to the facts, Sections 101.055 and 101.062 provide an independent basis for the City's liability because they waive the City's sovereign immunity. A waiver of sovereign immunity by the Legislature will not be found unless it is stated in clear and unambiguous language. *See Barfield*, 898 S.W.2d at 291; *Gonzales*, 978 S.W.2d at 622. Section 101.021, which bears the specific title "Governmental Liability," is found in Subchapter B of the Act which is generally entitled "Tort Liability of Governmental Units." Sections 101.055 and 101.062 are found in Subchapter C of the Act which is entitled "Exclusions and Exceptions." The location of these statutes in the Exclusions and Exceptions portion of the Act rather than in Subchapter B strongly indicates that they are not independent waivers of liability but instead are, as indicated by the title, exclusions and exceptions to liability under Subchapter B. Our conclusion is supported by comparing the language in Section 101.021 with the language in Sections 101.055 and 101.062 because there is nothing in the latter two sections which may be read as a clear and unambiguous waiver of sovereign immunity. Whereas Section 101.021 plainly states "[a] governmental unit in the state is liable for . . .," there is no similar language found in either Section 101.055 or Section 101.062 evidencing a clear intent to waive liability independent of Section 101.021. *See Bellnoa v. City of Austin*, 894 S.W.2d 821, 826 (Tex.App.—Austin 1995, no writ)(comparing Sections 101.021 and 101.0215 and holding that Section 101.0215 does not clearly and unambiguously waive sovereign immunity and is not an independent waiver of immunity; therefore, Section 101.0215 is subject to Section 101.021); *McKinney*, 814 S.W.2d at 865–66 (holding that Section 101.0215 does not waive immunity and that claims related to governmental function under that section must fall within Section 101.021). *See also Dalon v. City of DeSoto*, 852 S.W.2d 530, 535–36 (Tex.App.—Dallas 1992, writ denied)(where negligence claim related to a storm sewer, which is designated as a governmental function by Section 101.0215(a)(9), municipality is immune from liability because property damage did not arise from the operation or use of a motor-driven vehicle or motor-driven equipment as required by Section 101.021(1)(A)). Further, Section 101.055(2) provides that "[t]his chapter *does not apply*" to the type of claim described in the section so long as the employee's action is in compliance with laws and ordinances applicable to the emergency action. When read in context of the Act, we construe this as meaning that the governmental unit will retain its sovereign immunity by virtue of Section 101.055(2) even though waiver of immunity may exist under Section 101.021. Because we find that Section 101.055(2) is not a clear and unambiguous waiver of immunity, and in fact, provides added protection for a governmental unit, we hold that a claim arising from the action of a governmental unit's employee while responding to an emergency call is subject to Section 101.021. Similarly, Section 101.062 does not clearly and unambiguously waive the

sovereign immunity of a governmental unit. In fact, Section 101.062, like Section 101.055(2), provides additional protection for a governmental unit because it requires that the plaintiff allege and prove that the action forming the basis of the complaint violates a statute or ordinance. *See Fernandez v. City of El Paso*, 876 S.W.2d 370, 376 (Tex.App.—El Paso 1993, writ denied)(affirming dismissal of claim under Tort Claims Act where plaintiff failed to allege violation of statutes or ordinances relating to delayed response in emergency action, and therefore, the City of El Paso retained its sovereign immunity). Therefore, we hold that the City has sovereign immunity in an action involving a claim related to 9–1–1 emergency service only where governmental immunity is waived under Section 101.021 *and* where the action violates a statute or ordinance.

### Operation and Use of Motor Vehicle and Misuse of Motor Vehicle as Tangible Personal Property

We turn now to an analysis of whether the facts establish a waiver of sovereign immunity under Section 101.021. Appellees first allege that EMS employees wrongfully and negligently operated and used an emergency vehicle by transporting Mrs. Hernandez to Thomason rather than the nearest hospital in violation of EMS's Transport Policy Statement. They allege that this same action constitutes misuse of the emergency vehicle.

"Use" is defined in the context of Section 101.021(2) as "to put or bring into action or service; to employ for or apply to a given purpose." *Kerrville State Hospital v. Clark*, 923 S.W.2d 582, 584 (Tex.1996); *Borrego v. City of El Paso*, 964 S.W.2d 954, 957 (Tex.App.—El Paso 1998, pet. denied). Mere non-use of property is insufficient to support a claim under the Tort Claims Act. *See Clark*, 923 S.W.2d at 584; *Kassen v. Hatley*, 887 S.W.2d 4, 14 (Tex.1994). The Transport Policy generally requires that a patient with a non-life threatening emergency be transported to the hospital of their choice unless they do not have a preference or are unable to state one. Patients with life-threatening emergencies must be taken to the closest emergency department or acute care area located within a hospital. While the critical nature of Mrs. Hernandez's illness became obvious to treating physicians once she arrived at Thomason in that she had severe back pain and extremely low blood pressure, it is unclear whether the severity of her illness was apparent to EMS personnel who made the initial transport decision. Even if it could be said that a fact issue exists in this regard and it would be for a jury to determine whether EMS transported her to Thomason in violation of the transport policy, the dispositive question is whether these facts demonstrate a wrongful or negligent use of the emergency vehicle which would bring this claim within Section 101.021(1). The facts alleged by Appellees do not demonstrate that EMS personnel operated or used the emergency vehicle either in a wrongful or negligent fashion. Rather, the gravamen of Appellees' complaint is that EMS personnel made an incorrect medical decision regarding whether the decedent had a life-threatening emergency and, as a result, transported her to Thomason rather than Columbia East. This is essentially a complaint about a non-use of the vehicle which does not fall within Sections 101.021(1) or 101.021(2). *See City of Orange v. Jackson*, 927 S.W.2d 784, 786–87 (Tex.App.—Beaumont 1996, no writ)(decision by arresting officers to take injured arrestee to jail did not constitute negligent operation or use of squad car or misuse of tangible personal property because the real basis of the claim is the failure to use the police car to take arrestee to a medical facility).

Appellees next allege that Mrs. Hernandez's death resulted from EMS's negligent and wrongful operation or misuse of the emergency vehicle during the transport from Thomason to Providence. The actual basis of Appellees' complaint is not that some wrongful or negligent act

occurred during the inter-hospital transport but rather that EMS's delay in dispatching the ambulance caused Mrs. Hernandez's death. As stated above, the complaint is plainly directed at a non-use of the vehicle which does not fall within Section 101.021. *See Jackson,* 927 S.W.2d at 786–87.

### Use and Misuse of Other Tangible Personal Property

■ Appellees also contend that Mrs. Hernandez's death was proximately caused by EMS's use and misuse of other tangible personal property, namely, electronic communications equipment, computer equipment, telephones, two-way radio equipment, and dispatch equipment. They argue that because EMS includes "operator error" within its definition of "mechanical failure" as stated in its "Communications Division Policy and Procedure Manual,"[5] then Ponce's failure to timely dispatch the ambulance, which Appellees assert is "operator error" and therefore a mechanical failure of equipment, equates with a misuse of tangible personal property. Regardless of what is stated in the EMS communications manual, Raul Ponce is not tangible personal property and any error of judgment committed by him, no matter how egregious, is not misuse of tangible personal property. As was the case with the emergency vehicle, the facts alleged do not demonstrate that Mrs. Hernandez's death resulted from a use or misuse of the communications equipment within the meaning of Section 101.021(2). Even Ponce's use of the telephone to discuss personal matters with his supervisor rather than dispatching the ambulance is not a misuse of tangible personal property. To the contrary, it is a complaint about non-use of the equipment and misuse or non-use of intangible information

(the acceptance of Mrs. Hernandez by Providence), neither of which fall within Section 101.021(2). *See Clark,* 923 S.W.2d at 584; *University of Texas Medical Branch at Galveston v. York,* 871 S.W.2d 175, 178–79 (Tex.1994).

### Inadequate Condition of Tangible Personal Property

■ In order to establish waiver under Section 101.021(2) of the Act, Appellees also rely on an allegation that the inadequate condition of the communications system contributed to the delay which caused the death of Mrs. Hernandez. To properly state a claim involving the "condition" of property, it is sufficient to allege that defective or inadequate property contributed to the injury. *See Salcedo v. El Paso Hosp. Dist.,* 659 S.W.2d 30, 31–32 (Tex.1983); *City of Fort Worth v. Gay,* 977 S.W.2d 814, 817 (Tex.App.—Fort Worth 1998, no pet.); *Washington v. City of Houston,* 874 S.W.2d 791, 795 (Tex. App.—Texarkana 1994, no writ). Appellees rely on summary judgment evidence which reflects that at one point during the delay, all four lines at EMS became busy with calls so that additional calls "rolled over" to the fire department. Employees at the fire department would have been unfamiliar with this particular situation and could not have been of assistance. Appellees do not allege and there is no evidence, however, that any calls related to these events were "rolled over" to the fire department or that this condition of the system contributed to the delay. Consequently, Appellees' claim does not fall within Section 101.021(2).

For all of these reasons, we conclude that the City of El Paso was entitled to prevail on its defense of sovereign immunity. Accordingly, the trial court erred in denying the motion for summary judg-

---

5. Under Section 6, which is entitled, "Equipment Failure," the manual states: "General: As the entire communications system is comprised of electrical, electronic and mechanical components it is subject to failure. For the most part our system is rugged and very reli-

able and provides consistently good service. Failures may result as natural acts, lightning strikes, high winds, snow, ice, rain, solar and atmospheric activity. Most common are mechanical and electronic failures, as well as operator error."

ment.   Issues One, Two, Four, and Five are sustained.[6]   The order of the trial court denying the motion for summary judgment is reversed and the cause is remanded for trial against the remaining defendant.

---

**6.**  Because of our disposition, we need not   address the third issue.