COURT OF APPEALS














COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL PASO, TEXAS

 

CITY OF EL PASO, For Itself and on Behalf        )

of its Department, EL PASO WATER                   )

UTILITIES,                                                           )

                                                                              )

Appellant,                          )              
No.  08-02-00484-CV

                                                                              )

v.                                                                           )                    Appeal from the

                                                                              )

GLORIA MORALES, Individually
and on             )                
384th District Court

Behalf of The Estate of LUIS
CARLOS                 )

MORALES, Deceased, and as
Next Friend of       )           
of El Paso County, Texas

LUIS EMANUEL MORALES , LUIS                  )

CARLOS MORALES, JR., and
JOSE                  )          
        (TC# 2000-1259)

CARLOS MORALES, Minor
Children,                 )

                                                                              )

Appellees.                          )

                                                                              )

 

MEMORANDUM  OPINION

 

The City of El Paso (Athe City@),
for itself and on behalf of its department, El Paso Water Utilities (AEPWU@),
brings this interlocutory appeal of the trial court=s
denial of its motion for summary judgment pursuant to its plea to the
jurisdiction.  See Tex.Civ.Prac.&Rem.Code Ann. ' 51.014(a)(5)(Vernon Supp. 2004).  In six issues, the City contends the trial
court erred in denying its summary judgment motion because the cause of action
brought by Appellees Gloria Morales, individually and on behalf of the Estate
of Luis Carlos Morales, deceased, and as next friend of Luis Emanuel Morales,
Luis Carlos Morales, Jr., and Jose Carlos Morales, minor children
(collectively, AAppellees@) is barred under the Texas Tort Claims
Act.  We affirm.








The El Paso County
Lower Valley Water District (ALVWD@) is a municipal utility district which
provides water service, including waste water and solid waste, to customers in
Socorro and San Elizario in El
 Paso County.  In September 1995, the City acting through
its Mayor and EPWU[1]
entered into a contract with LVWD to provide project management services as a
professional Project manager for a complex multi-phase project, Phase III
$45,483,712 Water & Wastewater Project, implemented to provide water and
wastewater collection services to a portion of the City of Socorro, Texas and a
community of San Elizario, Texas, service area (Athe
Project@).[2]  Financial assistance for the Project was
provided by the Texas Water Development Board (ATWDB@) through the Economically Distressed
Areas Program Account and the Colonia Wastewater Treatment Assistance Program,
which consists of federal funds provided by the United States Environmental
Protection Agency and state matching funds.








Commitment
Condition No. 14 of TWDB Resolution 94-09, in which TWDB approved the Project,
required that prior to release of any portion of the financing amounts, LVWD
and EPWU execute a management agreement (the parties=
1995 contract) which specified the obligations to perform the Project
management, engineering, and construction of the Project to the satisfaction of
the TWDB Executive Administrator.  Under
the terms of the 1995 contract, EPWU as primary Project Manager and
Coordinator, was to issue Requests for Proposals and subcontract with
professional engineering firms for the planning, design, bidding, construction
engineering, resident project engineering, and land acquisition services, and
provide construction phase engineering management services for the
Project.  EPWU=s
project management services, with the assistance of its selected professional
engineering firms, were to include engineering, surveying, geotechnical
services, environmental or other consulting services as required.  The 1995 contract specified that the contract
commenced on September 12, 1995 and would continue until the construction of
the Project was finally accepted by LVWD and the Executive Administrator of the
TWDB unless terminated sooner under the contract terms.  Under the contract, LVWD agreed to compensate
EPWU for its actual costs and reimburse allowable and annually adjusted
indirect costs for the Project.

As part of project
implementation, LVWD entered into a construction contract with Garney
Companies, Inc. to serve as the contractor on part of the Project.  EPWU contracted with Parkhill, Smith &
Cooper, a design and construction engineering firm, to design the water and
wastewater system.  EPWU administered
both contracts as project manager.  Garney
was issued a Certificate of Final Completion effective February 23, 1999, when
the construction work on its part of the Project was completed.  Issuance of the certificate indicates that
the contractor has completed all its obligations under the contract and is
entitled to receive final payment.  The
prime contract between EPWU, as project manager, and LVWD, however remained in
effect.








On or about
September 2, 1999, Luis Carlos Morales, an equipment operator employee of LVWD,
with a crew, which included Parkhill employee John Quintero, were sent out into
the field to inspect the valves on the 36-inch water line because a service
area was experiencing low water pressure and unexplained water loss.[3]  Their assignment required that they check
each water manhole in the affected area and make sure the valves were
open.  One particular manhole was located
on a farmer=s
property, to which LVWD held a right-of-way easement.  The manhole by design was underneath about
two and a half to three feet of dirt so that the farmer could continue
cultivating his field above the water line. 
The manhole was a circular concrete encasement, with a steel cover and
dirt floor.  It was four-feet deep and
inside it contained a 

36-inch butterfly valve that
controls water flow.  The manhole was
designed to enable an employee to enter and perform valve operations inside the
hole with only one way in or out.  The
manhole had remained covered since the time it was built until the date of the
incident -- almost a year.  This was the
first buried manhole that had ever been opened on the water transmission line.








That morning, LVWD
Water Superintendent Fernando Sanchez received an emergency assistance call
from the site.  Within minutes, Mr.
Sanchez arrived at the site.  When he
arrived, Mr. Morales and Mr. Quintero were inside the manhole.  Two other crew members were venting the
manhole with pieces of cardboard to circulate some air into the manhole.  Mr. Morales was non-responsive, but Mr.
Quintero was responding to questions from the other crew members.  A volunteer fireman went into the manhole,
wearing a breathing apparatus.  He
administered CPR to Mr. Morales inside the manhole, tied a nylon rope around
him, and Mr. Morales was pulled out of the hole with a backhoe.  Mr. Morales was then taken to the hospital by
ambulance.  Mr. Quintero was also
similarly removed from the manhole, given oxygen, and transported to the
hospital.  Mr. Quintero survived the
accident, but Mr. Morales, unfortunately, died at the hospital.  Tests performed afterwards revealed the
presence of hydrogen sulfide in the manhole.

Although Mr.
Sanchez did have a concern about a hazardous environment inside the manhole
because of pesticides, no one inspected the manhole prior to the crew going out
there nor were any tests conducted prior to entry.  No protective equipment, ventilators,
respirators, or oxygen was provided to Mr. Morales.  The manhole did not provide any type of
ventilation in its design.  From his
experience and training, Mr. Sanchez believed that removing the manhole cover
for at least thirty minutes would provide adequate ventilation.

On April 12, 2000,
Appellees brought suit against LVWD, alleging inter alia that LVWD was
grossly negligent or malicious and liable under Texas Civil Practice and
Remedies Code ' 101.001
et seq.  In May 2000, Appellees
amended their petition to add Parkhill, Smith & Cooper, Inc. (AParkhill@)
as a defendant.  On December 26, 2000,
Appellees filed a second amended petition, adding the following defendants:
Garney Companies, Inc. (AGarney@), Public Service Board d/b/a El Paso Water
Utilities, and Maria L. Morales, Individually and as Administrator of the
Estate of Concepcion Trujillo, deceased.[4]  In their third amended petition on February
7, 2001, Appellees specifically added the City as a defendant.  On March 2, 2001, the City filed its answer,
which incorporated a plea to the jurisdiction. 
In the pleading, the City specifically plead the affirmative defense of
sovereign immunity.  The City also alleged
that at all times associated with the incident, it was exercising a governmental
function, i.e., the operation of a water and wastewater utility.








On July 24, 2001,
the City filed a motion for traditional and no-evidence summary judgment
pursuant to its plea to the jurisdiction. 
In its motion, the City asserted that on traditional summary judgment
grounds, it was entitled to summary judgment because its summary judgment
evidence established that as of September 2, 1999, the date of Mr. Morales= injury, the Project was complete.  Specifically, the City claimed it had no
employees at the Project site, it did not retain any right to supervise or
control the Project site, and it did not have any actual supervisory duties
under the contract.  Thus, the City did
not owe a duty to Mr. Morales and the plaintiffs had no cause of action
against it.  The City asserted that there
was no evidence that plaintiffs=
cause of action involved the use of a motor-driven vehicle or 

motor-driven equipment in order to
constitute waiver under the Texas Tort Claims Act.  The City claimed plaintiffs= petition failed to state any facts
which fall within the Act=s
waiver of immunity and they had no evidence which supports liability under the
Act.  The City also argued that A[m]erely providing solicited advice to
another political subdivision, about that other political subdivision=s own property, does not subject a
municipality to liability under the Texas Tort Claims Act,@ therefore it remained entitled to
sovereign immunity.

In their response,
Appellees asserted that its summary judgment evidence presented genuine issues
of material fact concerning the City=s
involvement in the project at the time the incident occurred.  Specifically, Appellees argued that the City
was liable as a joint venturer in the on-going project and that their claims
against the City were not precluded by governmental immunity because the City
was performing a proprietary function.

The trial court
denied the City=s motion
for summary judgment and the City now brings this interlocutory appeal.








Summary
Judgment

In a traditional
motion for summary judgment, the movant has the burden of showing, with
competent proof, that no genuine issue of material fact exists, and that it is
entitled to judgment as a matter of law. 
See Tex.R.Civ.P.
166a(c); Nixon v. Mr. Property Management Co., Inc., 690 S.W.2d 546, 548‑49
(Tex. 1985); Duran v. Furr=s
Supermarkets, Inc., 921 S.W.2d 778, 784 (Tex.App.‑-El Paso 1996, writ
denied).  When a defendant is the movant
for summary judgment, it must either disprove at least one element of the
plaintiff=s theory
of recovery or conclusively establish all essential elements of an affirmative
defense, such as sovereign immunity.  See
City of Houston v. Clear Creek Basin Authority, 589 S.W.2d 671, 678‑79
(Tex. 1979); Camacho v. Samaniego, 954 S.W.2d 811, 817 (Tex.App.‑‑El
Paso 1997, pet. denied). Once the defendant establishes its right to summary
judgment as a matter of law, the burden shifts to the plaintiff to present
evidence raising a genuine issue of material fact, thereby precluding summary
judgment.  City of Houston, 589
S.W.2d at 678-79; Camaho, 954 S.W.2d at 817.  In determining whether there is a disputed
material fact issue precluding summary judgment, all evidence favorable to the
non-movant will be taken as true; every reasonable inference must be indulged
in favor of the non‑movant and any doubts resolved in its favor.  Nixon, 690 S.W.2d at 548‑49.








A no-evidence
summary judgment is essentially a pretrial directed verdict and as such, we
apply the same legal sufficiency standard in reviewing a no-evidence summary
judgment as we apply in reviewing a directed verdict.  Wyatt v. Longoria, 33 S.W.3d 26, 31
(Tex.App.--El Paso  2000, no pet.).  The party seeking a no-evidence summary
judgment must assert that there is no evidence of one or more essential
elements of a claim or defense on which the non‑movant would have the
burden of proof at trial.  See Tex.R.Civ.P. 166a(i).  The movant must specifically state the
elements as to which there is no evidence. 
See Tex.R.Civ.P.
166a(i).  The burden then shifts to the
non-movant to produce evidence raising a fact issue on the challenged
elements.  See id.  To raise a genuine issue of material fact,
the non-movant must set forth more than a scintilla of probative evidence as to
an essential element of the non-movant=s
claim or defense.  See id.; Merrell
Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997), cert.
denied, 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998).  More than a scintilla of evidence exists when
the evidence A>rises to a level that would enable
reasonable and fair minded people to differ in their conclusions.=@  Havner, 953 S.W.2d at 711.  Less than a scintilla of evidence exists when
the evidence is Aso weak
as to do no more than create a mere surmise or suspicion@
of the existence of a fact, and the legal effect is that there is no
evidence.  Kindred v. Con/Chem, Inc.,
650 S.W.2d 61, 63 (Tex. 1983).  In
reviewing a no-evidence summary judgment ruling, we view the evidence in the
light most favorable to the non-movant, disregarding all contrary evidence and
inferences.  Havner, 953 S.W.2d at
711.

Notice
under Texas Tort Claims Act








In the City=s first three issues, it contends that Appellees
failed to provide it with timely notice of their negligence claim.  The City asserts that Appellees failed to
follow the notice requirements of Tex.Civ.Prac.&Rem.Code
Ann. ' 101.101
and argues that Appellees failed to prove the City had actual knowledge of the
incident for notice purposes.  The City
did not move for summary judgment on the basis of its alleged lack of
notice.  An appellate court cannot
consider issues not expressly presented to the trial court by written motion or
response in the summary judgment proceeding. 
See Tex.R.Civ.P.
166a(c); see also Casso v. Brand, 776 S.W.2d 551, 553 (Tex. 1989); McConnell
v. Southside Indep. Sch. Dist., 858 S.W.2d 337, 343 (Tex. 1993).  Issues One, Two, and Three are therefore
waived for purposes of appeal.

Governmental
or Proprietary Function

In Issues Four and
Five, the City contends Appellees failed to offer any evidence that City
property was involved, that the City=s
actions were discretionary, or done for the benefit of the inhabitants of the
City of El Paso.  Rather, the City
asserts, Appellees made only bare allegations that the City=s involvement was proprietary.








Sovereign immunity
protects the State of Texas, its agencies, and its officials from being sued
absent legislative consent.  Federal
Sign v. Texas Southern University, 951 S.W.2d 401, 405 (Tex. 1997).  A municipality, such as the City of El Paso,
is immune from liability for its governmental functions unless that immunity is
specifically waived. City of El Paso v. Hernandez, 16 S.W.3d 409, 414
(Tex.App.‑-El Paso 2000, pet. denied). 
A Texas municipal government is only immune for its governmental
functions; it has no immunity for any proprietary functions.  Williams v. City of Midland, 932
S.W.2d 679, 682 (Tex.App.--El Paso 1996, no writ).  When a municipality commits a tort while
engaged in proprietary functions, it is liable to the same extent as a private
entity or individual.  Texas River
Barges v. City of San Antonio, 21 S.W.3d 347, 356 (Tex.App.--San Antonio
2000, pet. denied).  Under Section
101.0215 of the Texas Tort Claims Act, certain municipal functions are defined
as governmental and others as proprietary. 
See Tex.Civ.Prac.&Rem.Code
Ann. ' 101.0215
(Vernon Supp. 2004).  The Texas
legislature has defined governmental functions as Athose
functions that are enjoined on a municipality by law and are given it by the
state as part of the state=s
sovereignty, to be exercised by the municipality in the interest of the general
public . . . .@  Tex.Civ.Prac.&
Rem.Code Ann. '
101.0215(a).  Proprietary functions are Athose functions that a municipality
may, in its discretion, perform in the interest of the inhabitants of the
municipality . . . .@
 Tex.Civ.Prac.& Rem.Code Ann. ' 101.0215(b); see also City of
Gladewater v. Pike, 727 S.W.2d 514, 519 (Tex. 1987)(proprietary function is
one performed by a city, in its discretion, primarily for the benefit of those
within the corporate limits of the city, rather than for use by the general
public).  A municipality retains its
immunity for activities which the legislature has defined as governmental,
except to the extent immunity is waived by acts, omissions, and conditions as
specified in the Act.[5]  See Williams, 932 S.W.2d at 682.

On appeal, the
City argues that among the governmental functions enumerated in Section
101.0215, its Water Utilities department typically engages in: sanitary and
storm sewers; waterworks; engineering functions; and water and sewer
service.  See Tex.Civ.Prac.&Rem. Code Ann. ' 101.0215(a)(9), (11)(30), and (32)(Vernon
Supp. 2004).  The City concedes that
acting as a program manager for LVWD does not fit neatly within the enumerated
governmental functions in Section 101.0215. 
However, it contends that under the facts of this case, the
circumstances dictate that it was performing a governmental function.








In support of its
summary judgment motion, the City attached the following evidence:  (1) the affidavit of Jason Seubert, Garney=s Contract Administrator/Project
Manager; (2) the Engineer=s
Certificate of Final Completion; and (3) an excerpt of deposition testimony
from EPWU contract manager Catherine Fiore. 
In Mr. Seubert=s
affidavit, he stated that he was the Contract Administrator/Project Manager for
Garney on the Project and was present at the job site during Garney=s involvement in project
construction.  Garney began its work at
the end of 1997, and in February 1999, Garney completed its construction of the
Project.  According to Mr. Seubert,
after February 23, 1999, the effective date of the Engineer=s Certificate of Final Completion, no
Garney employees remained at the Project site and Garney did not have any right
to control or supervise the Project site after that date.  In the excerpt from Ms. Fiore=s deposition testimony, she stated that
no EPWU personnel were present at the accident site and no EPWU vehicle or
other motor-driven equipment was involved in the incident.

In their response
to the City=s summary
judgment motion, Appellees included in its summary judgment evidence deposition
testimony and affidavits from numerous individuals related to this case.  Donna Maxwell, an El Paso Water Utilities
employee, was the project manager for the Phase III Water and Wastewater
Facilities Project.  Ms. Maxwell was
involved in working with LVWD on the Project to build new water lines.  Under the contract with LVWD, EPWU was to
manage the Project, which was funded by TWDB. 
Ms. Maxwell, as project manager, was one of two EPWU employees working
on the Project.  Ms. Maxwell explained
that her function as project manager was to interact with LVWD, the contractor,
and the engineer to ensure that they performed under the terms of the
contract.  Under the terms of the
contract with TWDB, funds were sent to LVWD, but EPWU ran the Project,
including determining which engineering firm would be hired to perform the
Project.  More specifically, Ms. Maxwell
stated that EPWU as project manager performed management functions as it
related to the contract documents, including processing payment applications
for the contractor from TWDB funds.








Ms. Maxwell stated
that under the contract, EPWU received funds through a reimbursement for hours
that designated employees devoted to the projects.  In the budget contained in the commitment
between LVWD and TWDB there was a line item for payment of money to the City of
El Paso for its work as project manager. 
This funding was separate from the project funding reflected in the
October 28, 1999 letter.  By its October
28, 1999 letter, the TWDB approved that the Project was complete in order to
release the final project monies, but according to Ms. Maxwell that date was
not the official completion of the job. 
The final payment was not made until TWDB approved the Project with that
letter.  Ms. Maxwell, however, indicated
that she had worked on the Project since 1995 and that it was Aongoing@
as of the date of her deposition testimony, October 10, 2001.








Ms. Maxwell could
not remember attending a meeting to discuss the water problem before Mr.
Quintero and Mr. Morales went out into the field, but she remembered the
problem with the water line.  LVWD was
experiencing low pressures and unexplained loss of water and thought there was
a closed valve on the 36-inch water line and there was an investigation conducted
to detect that valve.  Ms. Maxwell
learned of the problem from Parkhill by telephone and they discussed the
possible problem.  LVWD did some pressure
readings and fire hydrant readings, which confirmed there was a problem
somewhere in the water line.  Ms. Maxwell
stated that the idea of taking pressure readings was a joint idea between LVWD
personnel, Parkhill, and herself.  The
pressure readings in the area in question were found to be normal, however, the
unexplained loss of water pointed to the possibility of a partially open valve
on the 36-inch water line.  According to
Ms. Maxwell, it was a joint decision to send people from Parkhill and LVWD into
the field and check each manhole.  EPWU,
LVWD, and Parkhill all knew that a crew would be sent out to go into the
manholes to investigate.

Fernando Sanchez,
LVWD=s water
superintendent, explained the relationship between the parties in his
deposition testimony.  According to Mr.
Sanchez, EPWU manages all projects for LVWD and managed the program involving the
job.  It was his understanding that EPWU,
acting like a management company, hired Parkhill and Garney and that EPWU=s role was to design and supervise the
job.  EPWU was overseeing the project,
which included selecting the materials, selecting the type of system to use,
reviewing the plans and specifications, and working with the consultants and
contractors.  To Mr. Sanchez=s knowledge, EPWU was the one that
inspected the job during construction for compliance to specifications.  Once LVWD accepted the project, EPWU=s responsibility ended.

Mr. Sanchez stated
that in terms of the project being finished as a whole by September 2, 1999, Awe had some complications with this
project as to end the project altogether so we had been checking manholes maybe
already months in advance on that system to make sure that all of our valves
were open.@  For months before September 2, 1999, crews
had been checking manholes on the new line. 
Mr. Sanchez believed that as of September 2, 1999, EPWU was still
involved in this project








EPWU contracts
manager Catherine Fiore stated that her duties and responsibilities as an EPWU
contract administrator included writing, assisting in negotiation, and
administering design engineering and construction contracts.  Ms. Fiore explained that the contract between
EPWU and LVWD was written at the request of TWDB for the Public Service Board,
i.e., the City of El Paso, to assist the LVWD in administering and
managing all the projects that were issued in the economically distressed areas
program.  The contract was a management
agreement to cover EPWU=s
role to assist LVWD in managing all the design and construction contracts that
would be issued using Phase III funding bloc issued by TWDB.  According to Ms. Fiore, LVWD was relying on
EPWU for the design and construction decisions on the Project.  Ms. Fiore stated that the job involving
Garney was substantially completed on January 18, 1999.  The certificate of final completion on the
Garney bid was issued effective February 23, 1999 because the construction work
was completed.  The certificate to Garney
was issued on March 15, 1999 by Parkhill, approved by EPWU on March 25 and
executed by LVWD on March 30.[6]  Ms. Fiore explained that the certificate of
final completion means that the contractor has completed all its obligations
under the contract and is entitled to receive final payment.  According to Ms. Fiore, the prime contract
between EPWU as project manager and LVWD had still not been completed.








The summary
judgment evidence in this case shows that the City entered into a long-term
contract with LVWD to provide project management services for construction of a
multi-phase complex project.  The record
also contains a resolution adopted by the City Council on September 12, 1995,
which granted authority to enter the management contract.  The resolution states that Ait is in the public interest of the
citizens of El Paso to assist other water utilities located outside the city
limits of El Paso County if the City of El Paso provides water and water [sic]
and wastewater system management services; management services for water and
wastewater design and construction projects, and assistance in submitting
applications for financial assistance to implement water and wastewater system
projects . . . .@  While EPWU generally performs certain
governmental functions listed in Section 101.0215(a), namely sanitary and storm
sewers; waterworks; engineering functions; and water and sewer service, its
contract with LVWD was for professional management services related to LVWD=s activities in these areas, not its
own.  See Tex.Civ.Prac.&Rem.Code Ann. '
101.0215(a)(9), (11), (30), (32).  The
laundry list of governmental functions in Section 101.0215(a), however, is not
exhaustive.  See City of Houston v.
Southwest Concrete Construction, Inc., 835 S.W.2d 728, 730
(Tex.App.--Houston [14th Dist.] 1992, writ denied).  

Under Texas common
law, determining whether a city is performed a proprietary or governmental
function has generally been evaluated by examining whether the act performed by
the city as the agent of the State in furtherance of general law for the
interest of the public at large, or whether it is performed by the city, in its
discretion, primarily for the benefit of those within the corporate limits of
the city, rather than for the use by the general public.  See City of Gladewater, 727 S.W.2d at
519; Bailey v. City of Austin, 972 S.W.2d 180, 192-93 (Tex.App.--Austin
1998, pet. denied); Southwest Concrete Construction, Inc., 835 S.W.2d at
730‑31.  The key difference between
a proprietary and governmental function is that the city functions in its
governmental capacity when it performs functions mandated by the State.  Truong v. City of Houston, 99 S.W.3d
204, 210 (Tex.App.--Houston [1st Dist.] 2002, no pet.).  








In the City=s reply brief, it argues that it was
directed by the State to perform its duties under the contract, that LVWD could
not obtain funding for its construction project from TWDB because it felt LVWD
did not have the requisite experience to handle the Project, and that TWDB
would lend the money if LVWD hired a project manager with the requisite
experience, which turned out to be EPWU. 
Since TWDB is a state agency, the City asserts, all contract requisites,
regulations, and procedures handed down by TWDB to the City were state-mandated
and not merely assumed as a matter of discretion.  The record, however, does not support the
City=s
contentions as there is no evidence that EPWU was required to serve as the
project manager for the Project.[7]  The City also asserts on appeal that EPWU
services were performed in the interest of the inhabitants of Socorro and San
Elizario, not for the benefit of inhabitants of the municipality of El Paso.  While it is clear that the communities of
Socorro and San Elizario would benefit primarily from EPWU=s water and wastewater system
management services, the City entered into the contract based in part on its
determination that it was in the Apublic
interest of the citizens of El Paso to assist other water utilities located
outside the city limits in El Paso County . . . .@  Moreover, under the contract the City
received compensation for its actual costs and was reimbursed for allowable and
annually adjusted indirect costs.








After reviewing
the summary judgment evidence, we find that Appellees presented some evidence
which raises a genuine material fact issue as to whether the City was
performing a proprietary function.  If
the City was performing a proprietary function, the Texas Tort Claims Act does
not apply.  See City of Corpus Christi
v. Absolute Industries, 120 S.W.3d 1, 4 (Tex.App.‑-Corpus Christi
2001, pet. denied)(Tort Claims Act does not apply and the municipality is
subject to the same duties and liabilities as those incurred by private persons
and corporations when a tort is committed in the performance of a proprietary
function).  Moreover, there is some
evidence that the City was involved in the Project as project manager when the
incident occurred.  Therefore, the trial
court did not err in denying the City=s
traditional and no-evidence summary judgment motion.  Issues Four and Five are overruled.  Given our disposition of these issues, we
need not address the City=s
remaining issue concerning its liability under the Tort Claims Act.   

For the reasons
stated above, we affirm the trial court=s
order.

 

 

August
20, 2004

DAVID WELLINGTON
CHEW, Justice

 

Before Panel No. 2

Barajas, C.J., McClure, and Chew, JJ.











[1]
In deposition testimony, Catherine Fiore, EPWU contracts manager, explained
that EPWU is a department of the City, but it is operated by an independent
board.  EPWU is a 

self-sustaining organization
that is not funded by taxes, but rather is supported by water rates.  Witnesses referred to EPWU as PSB, or Public
Service Board, interchangeably, therefore for the sake of clarity, we will
refer to the entity as EPWU throughout this opinion.





[2]
In the record, the Project is also referred to as LVEP (or EDAP) Phase III CN
Common Water & Wastewater Project AA.@





[3]
Mr. Quintero stated in deposition testimony that the water problem and possible
solutions were discussed at a meeting at the Jonathan Rogers Water Treatment
Plant which he and various employees from Parkhill, LWVD, and EPWU
attended.  In deposition testimony, Dan
Knorr, a Parkhill director and employee, also described the meeting about the
water problem and stated that the meeting was held on EPWU facilities.





[4]
Defendant Maria L. Morales, Individually and as Administrator of the Estate of
Concepcion Trujillo, deceased, was later dropped as a party to this suit.





[5]
The Texas Tort Claims Act waives sovereign immunity from liability in three
general areas:  Ause
of publicly owned automobiles, premises defects, and injuries arising out of
conditions or use of property.@  Texas Dept. of Transp. v. Able, 35
S.W.3d 608, 611 (Tex. 2000);  see also
Tex.Civ.Prac.&Rem.Code Ann.
' 101.021 (Vernon 1997).  The Act also waives immunity from suit for
all claims for which it waives liability. 
See Tex.Civ.Prac.&Rem.Code
Ann. ' 101.025
(Vernon 1997).





[6]
Summary judgment evidence, however, also includes an affidavit from Ernesto
Gomez, a principal in C & G Septic Systems, a subcontractor for Garney, in
which Mr. Gomez states that his company continued to perform work and repairs
all summer of 1999 under Garney=s
direction and control at sites which were part of the Project, including the
manhole on the farm.  





[7]
While the City directs our attention to a recital in the parties= contract, which states that Commitment
Condition No. 14 of TWDB Resolution 94-09 requires that prior to the release of
any portion of the financing amounts, LVWD and EPWU Ashall
execute and deliver to the TWDB a management agreement . . .,@ the contract does not state that EPWU
was mandated by the State to be the project manager.