

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NOS. 02-10-00257-CR
## 02-10-00258-CR

CULLEN HORACE MCNAIR

APPELLANT

V.

THE STATE OF TEXAS

STATE

------------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In three points, Appellant Cullen Horace McNair appeals his two convictions for aggravated assault with a deadly weapon, to wit: a motor vehicle. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II.  Factual and Procedural History

Around 7 a.m. on July 15, 2009, McNair hit John Bird and Jimmy Shook—two union strikers—with his silver convertible as he drove into work at Bell Helicopter.

McNair, age seventy-seven at trial, had been employed for over forty years in the aerospace industry.[2]  He spent fifteen of those forty years in engineering at Bell, and he started working there immediately after he took early retirement from Lockheed, so that he could continue to care for his wife's serious medical problems.[3]  On July 15, he went in to work an hour early.  McNair gave the following testimony about the July 15 incident:

> Q.  Now, on this particular day when you came up to the entrance to Bell Helicopter, the plant itself, was there a line of cars waiting to get in?
>
> A.  No.  There was one car ahead of me . . . more than a car's length, and he was going through the picket line, and—but wasn't all the way through the line actually at that point.  So when I made my right turn off of Bell Spur onto the access road to the parking lot, the white line that they picket next to is just a few yards up from the turn, so, you know, I can't be going really very fast as I make a turn and come up there.  And so I went up, and I thought—I really fully expected that the picketers would just move aside because that's

---

[2]McNair was the only defense witness during the guilt-innocence phase of trial, and we begin with his testimony to provide context for the State's case.

[3]After several surgeries, McNair's wife Shirley developed a staph infection that spread, requiring amputation of her right leg at the hip.  She lost her left leg to the same infection.  While in intensive care, she suffered a stroke, leaving her left arm and left hand immobile.  McNair said that he continued to work to retain health insurance and that he paid someone to care for his wife while he was at work.  McNair said that he was also handicapped "to an extent."

the way they had been doing or were open at the other times I had gone in, and I didn't know that their—that their philosophy was to stop each and every car. So I decided to go on up and just kind of go behind the car in front of me, tailgate them through there, but I could see that they weren't happy with that, so—

Q. Let me ask you this. How could you tell that they weren't happy with you tailgating the other car?

A. Well, of course, they really wanted me to stop and not try to go through behind the other car. They wanted to be able to stop each car in turn and then give permission for it to proceed.

Q. Now, had this been the procedure that you had run into for the two or three weeks before—

A. No.

Q. –when they were picketing?

A. No. In those cases, the police actually kept the line open, and so I was used to that.[4] And when I—on the morning of my encounter, they were not that way, and so—but I expected that they would just move aside. I didn't know what their rule was, if you want to call it that, as far as letting the cars in and out. But what they like to do is to stop each and every car and not let two or three cars in, you know, one right behind the other.

Q. Did you know that at the time?

A. No. No, I didn't. Not until I got in amongst them.

. . . .

Q. And when you started through . . . and tried to inch behind the other vehicle, were there picketers actually in front of your car by that time?

---

[4]McNair said that there were more strikers than usual on July 15, and a police car was "parked up the road probably about 50 yards away," not down on the picket line itself.

A. No. The—I made sure that I got up close to the car to preclude any of them from trying to jump in front of me. They—so then they just surrounded my car, except in the back, but they—they came up very close to the sides.

. . . .

Q. When the—you were trying to drive in and the picketers came around you, what do you recall exactly happened at that point?

A. Well, it was then that I got—got rather concerned about trying to get through the line. Oh, I knew I could get through the line, but I was—I began to then realize that I was kind of surrounded by some unhappy folks, and they were slapping the side of my car with their hand[s], you know, causing no damage but making some racket, and—and I could hear some abusive language, and then I really got rather concerned. You know, I was going—I was driving my car with the top down that day, so I could see pretty good. So out of my peripheral vision on the right-hand side, I saw a man, in my opinion, did a body slam into my right door.

Q. Well, when you say "body slam into your right door," what do you mean?

A. Well, it looked—I could see that he kind of intentionally reared back and tried to throw his body into the door, and when he did, he got off balance, and then he went into my rear view mirror and pushed it forward. . . . He hit me on the side, on the right side, and I'm going forward, and they claim that I hit him.

. . . .

Q. Did you believe at that time that you had hit that individual.

A. No. I didn't think it was my fault, no.

Q. To this day do you believe that you hit that individual?

A. I believe—I believe, you know, that we—that I contacted that individual and that he was injured, and I sincerely regret any injuries in that incident. I certainly never ever intended to hurt anybody on purpose. I'm not that way. I'm a Christian. I'm a

4

member of a religious organization, and that's why I wear black, in case anybody's wondering about that. I'm a Benedictine.

. . . .

Q. When the strikers reacted, did you have any anticipation or thought that that would be their reactions?

A. No, I did not. Not until they hit—not until that person hit my car. And then—and then there were placards that were being waved around, and some even made a mark on my car. But then I became concerned that I might get hit because, like I say, the top's down on my car, and I began to get a little afraid. At that point, then I became a little angry.[5]

. . . .

Q. Did you at some point check your vehicle to see if there was any kind of damage to it?

. . . .

A. There . . . wasn't. I did stop my vehicle when I was up about maybe 30 yards or so for the purpose of checking to see if my door was bent in because I really thought it might have been, because it was really a hard hit. And so I got out of my car and walked around it and looked. The door was okay. There wasn't any damage. The rear view mirror was pushed forward. I just clicked it in position, and I went back around and got in my car and started moving to go to the parking lot.

Q. And at some point in time did you hear anybody telling you to stop?

A. Only after I was back into my car and started moving. Then—then I was almost directly across the street from the police car. And the police lady got out of the car and said, "Stop, stop," and I did . . . .

_____

[5]During cross-examination, McNair said that he became angry "right after the gentleman impacted my car on the right side." He also acknowledged that a car is capable of causing death or serious bodily injury.

Q.  And where did you stop?

. . . .

A.  Oh, I stopped about—oh, not but about a few yards up from where the police car was parked.  I didn't go far.  Because once they saw I was moving, she hollered "stop" and came over and then wanted to see my driver's license, insurance card, and I did, gave that.  Then she said, "Step out of the car."  I did.  "Turn around and face the car."  I did.  And then she said, "Put your hands behind your back."  At that point, I knew I was being arrested, but I had not a clue why.  So I said, "What's going on?"  What's the charge?"  And the police lady said, "Shut up.  You'll have your chance before the judge."  She said that twice and read me the Miranda act. [6]  Yeah.

Q.  Do you recall at some point her asking if you did that intentionally?

A.  No.  There was no conversation between me and that police woman except me saying, "What in the world is this?  What is the charge," and her telling me to shut up.

Q.  And that point in time, did you have any idea that you had hit anybody or harmed anybody?

A.  I did not.  Well, I knew the man impacted my car, but I certainly had not a clue that the other gentleman had his foot run over.  If he had his foot run over, it must have been pretty close to my car.

Q.  And did you—do you still believe that you actually hit the guy, or do you believe that the guy jumped onto you?

A.  No.  I'm still thoroughly convinced that he reared back and then threw his body into the side of my car.  They were really upset that I was moving through the line.

---

[6] *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

6

McNair said that there were three streaks on his hood that had been left by the strikers' placards, and photographs of the streaks were admitted in evidence. He said that he never had any intent to injure or hurt anybody and that he would not intentionally hit someone to get a person out of his way. McNair also stated that he was not in a hurry and that he did not become angry until Shook body-slammed his car. He denied accelerating or jerking his wheel but said that once the strikers became aggressive, he was anxious to get out of there.

Fort Worth Police Detective Patsy Miller testified that she met with McNair at her office after the incident and read him his *Miranda* warnings. After McNair waived his rights, he dictated his statement to Detective Miller's partner, who wrote out the statement for him because his hands were shaking and he was too upset to write, and then McNair signed it. Detective Miller read McNair's statement to the jury:

> Starting time, 8:18. Date, 7/15/09. My name is Cullen McNair. I am 76 years of age. . . . I have completed 16 years of schooling. I can read, write, and understand the English language.
>
> I was making a right turn off Bell Spur onto the property. There was a picket line of two or three lines abreast. Car ahead of me went through. They parted. I came right behind that car. As I got even with the line, they started slapping side of car. A man on the right intentionally bumped my car and hit mirror, moving it. I was creeping along, accelerated to go up the hill. They were harassing and giving me a hard time, slapping my car.
>
> A FW policeman was coming down the hill, told me to pull over. Officer came up to the car, asked for my driver's license and insurance. I didn't strike anyone I know of. Officers had me lean against car, then handcuffed me. A lot of police cars showed up.

7

I don't think I have any witnesses. I think they were being aggressive and harassing me. It was quick. Just bam bam. I went through. They took my company badge and card.

During cross-examination, Detective Miller stated that McNair told her numerous times that he did not hit anybody with his car and that the first he knew of it was when he was at the police station. She recalled telling him that he hit someone and that he said to her, "I didn't hit anybody that I know of."

Shannon Dyer, one of Bell's security guards, testified that on July 15, he arrived at the gate around 6:51 a.m. and saw several strikers. There was a car in front of him and the strikers held it up for around thirty seconds before allowing it to pass. They parted for him when they saw his uniform. Dyer observed that the situation was tense because the strike had gone on for so many weeks, and more strikers were there that morning than usual, although he did not see any yelling or aggression by the strikers.

Dyer did not recall if anyone was behind his vehicle. He had gone past the picket line and three-quarters up a hill to his parking spot when he heard an engine race and then a loud thud. When he looked in his rear view mirror, he saw two men limping, and he went back to help. Dyer said that the vehicle that struck the two men was a silver convertible and that McNair was the driver.

Linda Valentine, who worked for Bell for thirty-six years, testified that she was behind a little silver convertible on the way into the facility on July 15. There were fifteen to twenty strikers outside, walking one by one across the street; the strikers would allow a car to pass once they finished crossing to one side, and

8

"then they would cross again, and then another car would go." She said that the strikers did not appear hostile that morning and that she did not see them attack or damage any vehicles. Specifically, Valentine stated that she did not see anyone harass McNair or bump his vehicle, hit his mirror, or slap the side of his car. She described the incident as follows:

> [T]he silver car pulled in, and there was a vehicle in front of him, and, of course, the strikers were walking across, and it's like he wasn't going to wait. He just kind of—he just jerked the wheel and went and hit two of them. And I was behind him, and I just—I couldn't believe it.

Valentine said that McNair had not been tailgating the vehicle in front of his "because there had been people that crossed in front" of his vehicle. It looked to her like McNair was hurrying to get through and that he just jerked the wheel instead of waiting for the strikers to pass by, but, unlike Dyer, she did not hear anything from the vehicle. McNair did not pull over until the police officer told him to.

Fort Worth Police Officer Julie Cox testified that her off-duty job at Bell was to provide a police presence during a labor strike. The strikers would slowly walk back and forth across the street with their signs but were not allowed to impede traffic. Incoming cars would pull up, stop and wait a few seconds for strikers crossing the street, and once there was a break in the line of strikers, they would drive through.

On July 15, Officer Cox did not notice the strikers raise their voices, make harassing statements, or hit any vehicles. She was sitting in her parked patrol

9

car, watching the traffic and strikers and "doing some of [her] real-job paperwork," when she saw McNair hit a striker with his silver convertible sports car. She did not see anything to suggest that McNair was not in control of his vehicle, and she described the incident as follows:

> I saw the protester bounce off of the vehicle, and I actually was in shock because I'm sitting here going—I'm in a marked car. I just witnessed an accident, and I was just shocked. I was in awe of it, that it had just occurred in front of me. The speed it occurred almost seemed slow motion, and as it happened, the vehicle starts coming in the direction I'm coming, so I—you know, I know now that I have to get that vehicle stopped to make sure that he didn't drive away. So I quickly exit my vehicle, run after the silver vehicle to try to get it stopped.

> . . . .

> . . . After I ran after it and was trying to gain the attention of the driver, I was able to get the vehicle stopped. I approached the vehicle, and I asked the driver for his driver's license because I knew that A, I was able to identify him even if the driver left.

> . . . .

> . . . I knew that my primary duty was to make sure that whoever it was that was injured, that we got medical attention to them . . . so I quickly ran over to the—the pedestrians or the strikers that had been struck to make sure. Initially, I thought it was just one.

Officer Cox took McNair's driver's license before going to check on the injured man; she discovered two injured people—Shook and Bird. She called an ambulance for them and then ran back to McNair. Officer Cox stated that until she spoke with McNair, she had believed the incident to have been an accident.

Before trial, the trial court held a hearing regarding whether McNair was in custody when Officer Cox asked him, "Did you intend to do this? Was this an

10

accident?" Officer Cox said that she asked McNair these questions after taking his driver's license from him and telling him he needed to wait until she checked on the injured, and she said that she asked him this without giving him his *Miranda* warnings. Officer Cox said that McNair replied, "Yes, because they wouldn't let me get into work." She also stated that McNair was not in custody at the time—although he was not free to leave—and that she did not arrest him until after he responded to her question. Officer Cox admitted that she took McNair's driver's license and never returned it to him. The trial court found that McNair was not in custody at the time and overruled the objection.

Before the jury, Officer Cox testified that she asked McNair, "[I]f he intended to do that, if it was an accident," and said that he replied, "[Y]es, because they wouldn't let me get into work." She took his statement as an admission of intent and placed him under arrest for aggravated assault. Officer Cox stated that a motor vehicle is capable of causing death or serious bodily injury. She did not remember seeing any scratches on or damage to McNair's car.

Shook testified that he had worked for Bell Helicopter for twenty-three years and that he had been asked by his union to walk picket duty on July 15. Shook said that none of the strikers touched any of the vehicles, that they only allowed traffic to back-up two or three cars deep, and that they did not delay the cars' drivers from getting to work.

11

Shook said that he had been walking back and forth, carrying a sign; when he was around two-thirds of the way across the intersection, McNair gunned the motor of his car and hit him and Bird. Shook said that when McNair's car caught him on his left hip, he dropped his picket sign and went to the ground. He was stunned, scared, hurt, and very surprised that he had been hit. He hobbled to the curb and sat down while the silver convertible drove on, chased by Officer Cox. Shook did not recall McNair tailgating the car in front of him, and he denied that the strikers had hit McNair's car with their placards. He did not know if McNair sped up to hit him.

Bird testified that he had worked for Bell Helicopter for almost six years and, like Shook, his union had asked him to walk picket duty on July 15. Bird said that the strikers would not delay vehicles very long, just "slow them up a little bit." Bird gave the following testimony about the incident:

> I noticed this small car sitting there with a gentleman in front of it who didn't look very happy, and like I said, I just glanced at him for a second, and I thought, "That man is not happy," you know, about going to work or whatever. But, anyway, I turned around and took the last few steps, and I don't remember exactly how long it was, but it wasn't maybe five or ten seconds later, if that long, I heard an engine get gunned, and then the next thing I knew I was getting hit.

He identified McNair as the driver of the car that hit him.

Bird could not recall if he was carrying a sign that morning, but he said that McNair hit him on his left side and spun him around, and then McNair's right rear tire drove over the top of Bird's left foot, which hurt. Shook was on the ground not too far from him. Bird did not recall anyone striking McNair's car with signs or

12

yelling at McNair that two cars could not pass through, and he did not recall seeing any scratches on the hood of McNair's vehicle. Bird said that McNair must have been negligent because he had hit him and Shook, and he and Shook filed a civil negligence suit against McNair.

In separate indictments, McNair was charged with intentionally or knowingly causing bodily injury to Shook and Bird by driving into or over them with his vehicle, or by recklessly causing bodily injury to them by failing to properly control his vehicle and driving into or over them, and that he used a deadly weapon during the assault, to-wit: a motor vehicle that in its manner of use or intended use was capable of causing death or serious bodily injury. *See* Tex. Penal Code Ann. § 22.02(a)(2) (West 2011). McNair filed a motion to quash the recklessness allegation, which the trial court denied after a hearing.

The jury found McNair guilty in both cases, assessed two years' confinement in each case, and recommended the imposition of community supervision. The trial court entered judgment on the sentences, then suspended them, and placed McNair on two years of community supervision in each case. These appeals followed.

### III. Sufficiency

In his third point, McNair argues that the evidence is insufficient to convict him of aggravated assault in each case. However, because we measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge—i.e., one that accurately sets out the law and

13

is authorized by the indictment, among other requirements—we will review McNair's first point regarding the sufficiency of the indictment before reviewing the sufficiency of the evidence. *See Hardy v. State*, 281 S.W.3d 414, 421 (Tex. Crim. App. 2009); *see also Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App.), *cert. denied*, 130 S. Ct. 515 (2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

## A. Indictment

In his first point, McNair complains that the trial court erred by overruling his motion to quash the indictment because it failed to allege with reasonable certainty the act or acts relied upon to constitute recklessness.

We review de novo a trial court's decision to deny a motion to quash an indictment. *Lawrence v. State*, 240 S.W.3d 912, 915 (Tex. Crim. App. 2007), *cert. denied*, 553 U.S. 1007 (2008). A motion to quash should be granted only when the language concerning the defendant's conduct is so vague or indefinite as to deny the defendant notice of the acts he allegedly committed. *Miller v. State*, 333 S.W.3d 352, 356 (Tex. App.—Fort Worth 2010, pet. ref'd) (citing *DeVaughn v. State*, 749 S.W.2d 62, 67 (Tex. Crim. App. 1988)). Further, while the State need not allege facts that are merely evidentiary in nature, *see id.*, "[w]hen it is alleged that the accused acted recklessly, [a]rticle 21.15 of the Texas Code of Criminal Procedure requires additional language in the charging instrument." *State v. Rodriguez*, 339 S.W.3d 680, 682 (Tex. Crim. App. 2011); *see also* Tex. Code Crim. Proc. Ann. art. 21.15 (West 2009).

14

The "acts" constituting recklessness under article 21.15 are really the circumstances surrounding the act, from which the trier of fact may infer that the accused acted with the required recklessness. *Rodriguez*, 339 S.W.3d at 683 (discussing *Smith v. State*, 309 S.W.3d 10, 15 (Tex. Crim. App. 2010)); *see Stadt v. State*, 120 S.W.3d 428, 441–43 (Tex. App.—Houston [14th Dist.] 2003) (pet. granted) (op. on reh'g) (stating that the indictment adequately informed appellant of the acts the State planned to rely upon to constitute "recklessness" in a manslaughter charge when it stated that he operated his vehicle at an unreasonable speed, failed to keep a proper lookout, failed to maintain a single lane of traffic, and changed lanes unsafely), *aff'd*, 182 S.W.3d 360 (Tex. Crim. App. 2005); *see also Crume v. State*, 658 S.W.2d 607, 608–09 (Tex. Crim. App. 1983) (holding that indictment adequately informed appellant of the nature of the reckless act of which he was accused when it alleged that he caused his vehicle to collide with the complainant by failing to guide his vehicle away from the complainant, thereby recklessly causing the complainant's death); *Arredondo v. State*, 582 S.W.2d 457, 458–59 (Tex. Crim. App. 1979) (holding that the indictment was sufficient because it alleged the act constituting the forbidden conduct and the act demonstrating recklessness: recklessly causing victim's death "by grabbing the steering wheel of a motor vehicle and pulling said steering wheel to the right . . . thereby recklessly causing said motor vehicle to veer to the right and strike" the victim).

With regard to reckless conduct, the indictment alleged that McNair committed the aggravated assaults with a deadly weapon of Shook and Bird by causing them bodily injury by driving his vehicle into or over them "recklessly, to-wit: *by failing to properly control his motor vehicle*." [Emphasis added.] Because the indictment alleged the circumstance—failure to properly control his vehicle—that gave rise to the act constituting the aggravated assault with a deadly weapon—causing bodily injury to Shook and Bird by driving the vehicle into or over them—we are constrained to conclude that it was sufficient. *See Crume*, 658 S.W.2d at 608–09; *Arredondo*, 582 S.W.2d at 458–59; *see also Rodriguez*, 339 S.W.3d at 683; *Stadt*, 120 S.W.3d at 441–43.

Further, we also note that under *Crawford v. State*, an indictment that alleges a defendant acted intentionally, knowingly, and recklessly need not comply with the article 21.15 requirements. 646 S.W.2d 936, 937 (Tex. Crim. App. 1983); *see also Bartlett v. State*, 249 S.W.3d 658, 672 & n.9, 673 (Tex. App.—Austin 2008, pet. ref'd) (stating that *Crawford* holds that article 21.15 governs only when recklessness is the sole culpable mental state alleged and not when recklessness is alleged along with intentional or knowing conduct). Although the indictments here improperly labeled the second paragraphs of the offenses as "counts," because they merely added an additional culpable mental state, they did not allege separate statutory offenses. *See* Tex. Code Crim. Proc. Ann. art. 21.24(a)–(b) (West 2009) (differentiating "counts" for charging separate offenses and "paragraphs" for charging the same offense); *Lebo v. State*, 100

S.W.3d 417, 421 (Tex. App.—San Antonio 2002, pet. ref'd) (op. on reh'g) (stating that "[t]he words 'intentionally, knowingly, and recklessly' . . . as used in the indictment alleging that defendant intentionally, knowingly, or recklessly injured an elderly person did not constitute three distinct offenses," and that adding an additional mental culpable state does not allege a separate statutory offense); *Riley v. State*, 658 S.W.2d 818, 819 (Tex. App.—Fort Worth 1983, no pet.) (reciting that a "count" is used to charge an offense and a "paragraph" is a portion or subset of a count charging a method of committing that offense, and stating that a general verdict is proper for a one count indictment alleging multiple paragraphs). Therefore, under *Crawford*, even if the language in the indictment was not sufficient for recklessness under article 21.15, the indictments would still be sufficient because they also alleged the intentional and knowing mental culpable states. *See* 646 S.W.2d at 937. We overrule McNair's first point.

## B. Aggravated Assault with a Deadly Weapon

In his third point, McNair argues that the evidence is insufficient to support his convictions for aggravated assault with a deadly weapon because the evidence shows that he was nothing more than "merely negligent" and that there was no credible evidence of any reckless conduct on McNair's part.

### 1. Standard of Review and Applicable Law

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the

17

essential elements of the crime beyond a reasonable doubt.[7]  *Jackson v. Virginia*,

443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d

772, 778 (Tex. Crim. App. 2007).

A person commits aggravated assault with a deadly weapon if he

intentionally, knowingly, or recklessly causes bodily injury to another and uses or

exhibits a deadly weapon—here, an automobile—during the commission of the

assault.  *See* Tex. Penal Code Ann. § 22.01(a)(1) (West 2011), § 22.02(a)(2);

*see also id.* § 1.07(a)(17)(B) (West Supp. 2011) (defining "deadly weapon" as

anything that in the manner of its use or intended use is capable of causing death

or serious bodily injury); *Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App.

2005) ("A motor vehicle may become a deadly weapon if the manner of its use is

capable of causing death or serious bodily injury.").  A person acts intentionally

when it is his conscious objective or desire to cause the result; he acts knowingly

with respect to the nature of his conduct when he is aware that his conduct is

reasonably certain to cause the result.  *See* Tex. Penal Code Ann*.* § 6.03(a), (b)

(West 2011).  In comparison to these mental states,

> [a] person acts recklessly, or is reckless, with respect to
> circumstances surrounding his conduct or the result of his conduct
> when he is aware of but consciously disregards a substantial and
> unjustifiable risk that the circumstances exist or the result will occur.

[7]With regard to McNair's first point, addressed below, regarding the admissibility of Officer Cox's testimony, we must consider all the evidence admitted at trial, even improperly admitted evidence, when performing a sufficiency review.  *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004).

18

The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*See id.* § 6.03(c).

### 2. Analysis

McNair admitted that a car can be a deadly weapon and that he was aware of the proximity of the strikers to his vehicle as he drove through, although he said that one of the men intentionally "body slammed" his car.  From this, the jury could have found that he acted recklessly if it also found that he failed to properly control his vehicle as he drove through.  The jury could have found lack of proper control from Shook, Bird, and Dyer's testimonies that McNair gunned his motor before hitting the strikers and from Valentine's testimony that he "just jerked the wheel and went and hit two of them."  Further, from the same evidence regarding how McNair gunned his motor and drove into the two men, the jury could have found that McNair met the intentional and knowing mental states, supported by Officer Cox's testimony that she took McNair's statement to be an admission that he intended to hit Bird and Shook because they would not let him into work.  Bird and Shook's testimonies establish that each man's injury was caused by McNair using his vehicle.

Because our sufficiency standard gives full play to the responsibility of the trier of fact, as the sole judge of the weight and credibility of the evidence, to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable

19

inferences from basic facts to ultimate facts, we conclude that the jury could have found beyond a reasonable doubt that McNair committed the aggravated assault with a deadly weapon of both Bird and Shook. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778; *see also Bell v. State*, 693 S.W.2d 434, 443 (Tex. Crim. App. 1985) ("[T]he jury, as the sole trier of fact, was entitled to believe all or part of the conflicting testimony proffered and introduced by either side."). Therefore, we overrule McNair's third point.

### IV. Custodial Interrogation

In his second point, McNair argues that the trial court erred by overruling his objections to the State's use of his statement to Officer Cox in response to her custodial questioning. Specifically, he complains that he was in custody when Officer Cox asked him, "Did you intend to do this? Was this an accident?" and that, therefore, her testimony about his response—"Yes, because they wouldn't let me get into work"—should not have been admitted.

During trial, McNair testified that Officer Cox arrested him almost immediately after she stopped him and he gave her his driver's license, that she read him his *Miranda* rights, and that she did not ask him if he had intentionally hit anyone or say anything else to him other than "Shut up. You'll have your chance before the judge." McNair's written statement to the police indicates that Officer Cox asked him for his driver's license and insurance, but it does not indicate if or when she asked him the questions at issue here.

20

According to Officer Cox's testimony during the pretrial hearing and during trial, McNair was detained but not in custody when she took his license, and according to McNair's testimony, he was in custody immediately but was not asked any questions. *See Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). Assuming without deciding that McNair was in custody when Officer Cox took his driver's license and told him to wait for her before she asked him whether he had intentionally hit the strikers, and that, therefore, the trial court erred by admitting her testimony about McNair's statement, we conclude—as set out in our analysis below—that the error is harmless, determining beyond a reasonable doubt that the trial court's admission of the statement did not contribute to McNair's conviction or punishment. *See* Tex. R. App. P. 44.2(a); *Jones v. State*, 119 S.W.3d 766, 776–77 (Tex. Crim. App. 2003) (applying rule 44.2(a) analysis to *Miranda* violation), *cert. denied*, 542 U.S. 905 (2004).

## A. Harmless Error

In applying the "harmless error" test, our primary question is whether there is a "reasonable possibility" that the error might have contributed to the conviction or punishment. Tex. R. App. P. 44.2(a); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999). Our harmless error analysis should not focus on the propriety of the outcome of the trial; instead, we should calculate as much as possible the probable impact on the jury in light of the existence of other evidence. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944

(2001). We consider a nonexclusive list of factors, including the nature of the error, whether it was emphasized by the State, the probable implications of the error, and the weight the jury would likely have assigned to it in the course of its deliberations. *Snowden v. State*, No. PD-1524-10, 2011 WL 4467280, at *4 (Tex. Crim. App. Sept. 28, 2011) ("At bottom, an analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.'").

**B. Analysis**

The alleged error was the admission of McNair's statement in response to Officer Cox's compound question, "Did you intend to do this? Was this an accident?" The first portion of McNair's response, "Yes," could answer either question, but the rest of his response, "because they wouldn't let me get to work," makes clear that he committed an intentional act. However, this was not the only evidence of intent admitted during the trial. Further, McNair himself testified that he had no intent to hit anyone nor any knowledge at the time that he had hit anyone but acknowledged that the strikers had surrounded his car and that a car is capable of causing death or serious bodily injury. From this, the jury could have determined that if he failed to properly control his vehicle when he hit Shook and Bird, then he had been reckless. As set out above, the jury also had sufficient evidence to determine that McNair had failed to properly control his

22

vehicle based on Valentine's testimony that he jerked the steering wheel "and went and hit two of them" from her view in the car behind him. And additional evidence besides Officer Cox's recitation of McNair's statement to her supported findings of intent or knowledge.

During closing arguments, the State began by telling the jury how to read the charge and by asking the jurors to "hold Mr. McNair responsible and accountable for what he did to Jimmy Shook and to John Bird and that you find him guilty of aggravated assault with a deadly weapon." McNair's counsel then argued that Officer Cox was not paying attention when the incident occurred because she had been focusing on her paperwork and that although she testified that McNair said that he did it because he was trying to get to work, that it was disputed that McNair even heard her question in light of McNair's and Detective Miller's testimonies. McNair's counsel also argued that the streaks on McNair's vehicle from the signs showed the chaos that reigned on the picket line that day and supported McNair's version of events. And he argued that McNair was an old man who did not intend to hurt anyone but who just intended to get to work— work that he needed to support his disabled wife and that he would not have endangered because that would have affected his ability to care for her. Finally, he pointed out that Shook and Bird admitted that at best, McNair was negligent, as evidenced by their civil lawsuit against him.

In rebuttal, the State argued that McNair was a selfish man who put getting to work above the safety of pedestrians, pointing to Valentine's testimony about

McNair jerking the steering wheel and accelerating and Bird's testimony that McNair looked angry before addressing Officer Cox's statement that McNair said he did it because the strikers would not let him get to work. The State then reiterated Officer Cox's exact quote before returning to Valentine's testimony and then Dyer's testimony regarding what they saw or heard and that only McNair claimed that the strikers hit his car with signs and behaved aggressively. Therefore, the State did not emphasize Officer Cox's testimony until McNair attacked her credibility during his closing argument, and it emphasized the testimony within the context of the State's other witnesses' testimonies.

During its deliberations, the jury sent out two notes. The first note indicated that the jurors were deadlocked, six to six. In the second note, the foreperson asked, "When reviewing the charges when it say[s] 'You should consider the charge as a whole,' if there is doubt on intent, with knowledge, can we find him guilty for restlessness [sic] only?" The trial court referred the jury back to the charge. These questions give us a better idea of the probable weight that the jurors would likely have assigned the error in the course of its deliberations—that is, they clearly struggled with a determination of intent despite Shook, Bird, Dyer, Valentine, and Officer Cox's testimonies. And, as set out above, based on the evidence presented at trial, there was sufficient evidence for the jury to convict him of aggravated assault with a deadly weapon with a reckless mental state. Therefore, we conclude that there is no reasonable

24

possibility that the error could have contributed to his conviction. *See Mosley*, 983 S.W.2d at 259.

With regard to whether the error contributed to McNair's punishment, the State presented no witnesses during the punishment phase. McNair presented five in addition to his own testimony.

McNair told the jury that he had never been convicted of any criminal offense and asked for the minimum sentence and for community supervision. He told the jury that he and his wife had been married for thirty-five years, about the arrangements he had made to take care of her while he worked because she required "24/7" care, and about his children, who were not responsible and who would not step up to replace him to take care of their mother if he were sent to jail. McNair said that his wife was adamantly opposed to a nursing home, that he had promised her "a long time ago" that he would take care of her at home, and that he would probably have to place her in a nursing home if he went to jail.

The other witnesses—Julian Escamilla, John Costanza, Marie Bell, Donail Williams, and Thomas Reilly—who had known McNair from two to sixteen years, described McNair as a good, experienced, talented, helpful, and hard-working person. Each remarked on McNair's wife's severe physical condition and stated that there would be absolutely no benefit to society or to McNair for him to go to jail. Escamilla stated, "Seventy-seven years of living a good, honest life, never been in trouble. No, there's no benefit." Costanza described McNair as "a contributing person to the community, his church," and a "real nice gentleman to

25

be around" who never refused a request for help. Bell described McNair's life as, "He basically does everything. He leaves work, goes home, takes care of [his wife], and then comes back to work the next morning." Williams explained that McNair should not be sent to jail, stating

> I know Mack, and I've [known] him for a long time, and Mack will not hurt anyone, you know. He's just a very kind person. He's very hard working. He and I have had many conversations talking about many different things, and this guy does not have a bone in his body that would be malice [sic] in any kind of way. He just—he isn't that kind of person.

Reilly, McNair's last witness, described McNair as "the kind of guy you want to be. Kind, religious, helpful, caring, hard working. Just a good guy." He told the jurors that McNair's wife needed him at home and agreed that the defense could take days putting more people on to talk about McNair because McNair had a lot of very good friends. All of McNair's witnesses asked the jury to consider the minimum sentence and to recommend community supervision to the trial court.

The State waived its opening argument during the punishment phase. McNair's counsel argued that McNair deserved the minimum punishment—two years—and that the jury should recommend to the trial judge that the sentence in each case be probated. He also pointed out that for a man as old as McNair, two years could very well be a life sentence. The State then closed by asking the jury to sentence McNair appropriately "according to the testimony and all the evidence that you've seen in this case." The jury sentenced McNair to two years' confinement in each case and recommended that the imposition of the sentences

be suspended and that McNair be placed on community supervision, and the trial court imposed these sentences, suspended them, and put McNair on two years' community supervision—the punishment McNair had requested.

After carefully reviewing the record and performing the required harm analysis under rule 44.2(a), we hold beyond a reasonable doubt that the trial court's error, if any, by allowing Officer Cox's testimony about McNair's response to her un-Mirandized compound question did not contribute to McNair's conviction or punishment. *See* Tex. R. App. P. 44.2(a). We overrule McNair's first point.

## V. Conclusion

Bearing in mind that we may not substitute our judgment for that of the fact finder, *see Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000), and having overruled McNair's three points, we are constrained to affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL: WALKER, MCCOY, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: November 23, 2011